JOHN H. SLATER, Appellant, v. WM. SLATER, SR., et al., Appellees.

**DEEDS: Undue Influence and Intoxication.** Evidence reviewed, and held insufficient to establish the invalidity of a deed by reason of undue influence on the part of grantee, or intoxication on the part of grantor.

*Appeal from Worth District Court.*—M. F. EDWARDS, Judge.

APRIL 4, 1918.

SUIT in equity to set aside a deed on the ground of undue influence and false representations in obtaining the same, and on the ground that the plaintiff was intoxicated when he executed the same, to such an extent that he did not know what he was doing. After a full hearing upon the merits, the trial court dismissed the petition, and the plaintiff appeals.—*Affirmed.*

*Dunn, Bryant & Clough,* for appellant.

*Robinson & Boomhower* and *Gordon & Osmundson,* for appellees.

EVANS, J.—The plaintiff is the son of the defendant. The deed in question was executed on September 10, 1904, and conveyed the plaintiff's undivided one half in a farm of 200 acres. The evidence involves the history and the personal characteristics of the parties. The defendant and his wife, Sarah, moved upon the farm in question about 1872 or 1874, and lived together thereon with their family until 1897. At this time, there was a separation between husband and wife, and a decree of divorce. The title to the farm was in the name of the wife. A stipulation as to alimony gave her the full ownership thereof, subject to an undertaking by her to pay alimony to the defendant in the sum of $2,500. The mother and the two sons, John and William, continued to live upon the place. The defendant removed to Minnesota, from there to North Dakota, and back to Minnesota again. He remarried. He sometimes visited the family at the old home. He visited there for a short time in the summer of 1904. Shortly thereafter, on August 2, 1904, the divorced wife, Sarah, died. The defendant came to the funeral. He remained upon the place for some weeks. Both John and William were unmarried. John was born in the year 1867, and William was about two years older. John, the younger, however, managed the place, after a fashion, for his mother. William had been injured, and was of little economic value. John was addicted to the use of intoxicating liquors, and was of still less economic value. As a witness, he testified:

"I began drinking heavily in 1898. Drank about a quart a day,—sometimes a little more or less,—of whiskey. Continued drinking this way through '99 and 1900, and on up to 1906. Lived on the farm until 1904, save for two winters spent in Chicago, the winters of 1901–2 and 1902–3. Drank heavily in Chicago, sometimes taking as many as fifteen drinks of whiskey a day. During 1902 and 1903, dur-

ing the time I was at home, would go to Mason City or
Minneapolis on drunken debauches. Would get drunk fre-
quently at Joice and Hanlontown.. Kept liquor about the
farm. Drinking sometimes more than a quart a day. Con-
tinued this until the time the purported deed was signed,
in September, 1904. Consumed about a quart daily, except
a few times that I might be out of it, and unable to get it.
Would go on drinking spells lasting three or four days."

He testified with much particularity as to times and
places concerning all his movements for the first ten days
of September. According to such testimony, he was be-
sottedly drunk during every part of every day of such pe-
riod. The claim on his behalf is that such was his condition
at the time that he executed the deed. He testified that he
had no recollection of having signed it, and did not know
that he had signed it. He introduced the testimony of other
witnesses in corroboration. Several of these were persons
who shared his bottle and the joys and sorrows thereof.
On the other hand, it is made to appear for the defend-
ant, by witnesses fully as credible, and apparently disin-
terested, that John was apparently sober, at the time of
signing such deed. The case is purely a fact case. The
evidence is not very satisfactory on either side. The plain-
tiff's accurate memory of all the details of a ten-days' spree
is not consistent with his utter forgetfulness of the trans-
action pertaining to the deed. On the morning of Septem-
ber 10th, the father and son had driven from their home
to Northwood, a distance of 17 miles. They appeared at a
bank, where they seemed to have been acquainted, for the
purpose of having the deed made. The banker referred them
to a reputable attorney, to whose office they went. He was
a stranger to both parties. He talked the transaction over
with the plaintiff alone. He was a witness upon the trial.
He appears to have been entirely disinterested as between
the parties. According to his testimony, the plaintiff gave

no evidence of intoxication at that time.   Several witnesses
who saw the plaintiff the same forenoon testified substan-
tially to the same effect.   Taking the testimony as a whole,
we have no doubt that the plaintiff understood that he had
executed the deed to his father.   He had no intention of
staying on the farm.   About a week after the deed was ex-
ecuted, he returned to the farm and spent a couple of days
there, and then left.   His itinerary is described by him as
follows:

"He gave me $50, the day that I left.   I went to Min-
neapolis and stayed there about a week.   Went from there
to Fergus Falls, and remained until the following April,
1905.   Then went to North Dakota, worked through the
harvest and threshing.   In October, went into the pineries
in Minnesota.   During that time, continued to drink all
that I could consume.   Later, went to southern Arkansas,
and remained until May, 1906.   Continued drinking while
there.   From Arkansas, went to Kansas City, Missouri, and
then out into the harvest fields in western Kansas.   After
leaving there, went to Springfield, Illinois.   Remained at
Springfield from 1906 until July or August, 1908.   Con-
tinued to drink at Springfield, not so heavily.   From Spring-
field, in July or August, 1908, went to High Forest, Minne-
sota.   Father was living there."

Later in 1910, he worked for a time in and about Ma-
son City.   Thereafter, he went to Missouri, and later, to
Montana.   More or less correspondence was carried on con-
tinuously between father and son.   The consideration for
the deed was indefinite.   The deed purported to be for a
consideration of $100.   The plaintiff's title was acquired
through the will of his mother, not yet probated.   There
was much indebtedness.   There was a mortgage for the
principal sum of $2,750.   There was a further lien of the de-
fendant's himself for $1,500 unpaid alimony.   There was a
large amount of personal indebtedness, besides.   More than

two years' interest was in arrears, and two years' taxes, like-wise. The father had advanced to the son considerable money previously. The evidence of value of the farm consists solely of one statement in evidence on the part of the defendant that the property could not have been sold for more than $40 an acre, but that it ought to have been worth $50. It appears, also, that, at the very time this deed was made, the plaintiff had outstanding checks issued by him which were fraudulent, in the sense that he had no funds on deposit to meet the same. Shortly after his de-parture from home, he was arrested in Minneapolis, and there held in jail upon charges pertaining to such checks. The father, being sent for, came to his aid, and obtained his release by the payment of his obligations. The fact of the previous issue of these checks has some tendency to explain the conduct of the plaintiff in his apparent desire to deed the farm to his father. By the deed, the father became a tenant in common with his son William, who took, under the will of his mother, the other undivided one half. In the settlement of the mother's estate, the personal property was not sufficient to pay the personal debts. The defendant assumed and paid all the unpaid debts, for the purpose of protecting himself and William against a sale of the land. He also proceeded to make valuable improvements upon the farm. He built thereon a large barn and a hog house, a double corn crib, new fences, and a cement-floored yard for feeding hogs,—all of which was known, from time to time, by the plaintiff. In the matter of the obligations as-sumed by the defendant and the expenditures incurred by him, he appears to have understood that one half thereof would rest as a charge upon the interest of William in the real estate, or that he should be reimbursed by William's obligations. There appears to have been later some disap-pointment or misunderstanding on that subject between him and William. There was some correspondence pertain-

ing thereto, to be referred to later. John and William were
the only living children of the defendant. Many of his let-
ters to them are in evidence, and they indicate a continuing
affection for his boys, with occasional flashes of criticism
and combative repartee, probably consistent with his gen-
ealogy. On October 30th and November 9th, 1914, he wrote
letters, one to William and the other to John, from his
home in Minnesota, both William and John being then in
Montana.

On November 18th, John answered him as follows:

"Dear Sir: Your favor of the 9th at hand. You either
won't start something or near the verge of insanity. Wm.
owes you nothin on that old acct. of Mrs. Sarah Slater.
Any person with the brains of sons would understand that.
I would advise you not to crowd me too far. He always
had lots of regard for you, and a kind word went a long
ways with him from my obessains. You have treated him
like a yellow dog they say the most menial of worms will
turn. I think you better show a latent spark of manhood
and send some of that rent money, all we have mad' this
sumer. We have put back in the claims I am not going to
waste any work on you in my own behalf. You know what
belongs to me. I am going to get the regardes of cash.
When the men of the west started in to rid it of cut throats
and outlaws they found the best way was to shoot first and
talk after. If you cant act the man with me we had better
cease correspondence. If you try to onload any wind on me
or shove his claw through I will tell you a few thing that
will burn in your brain while life lasts. You probably will
see me sooner than you desier.

"John H. Slater, Grass Range, Montana."

In January, 1911, the defendant wrote to John as fol-
lows:

"I received your letter and am glad to hear you are
well. William stopped with me last night and started for

South Dakota this morning—going to be married to some lady there. He had 2.25 Two hundred and 25.00 from Mr. Roeder and settled up last Saturday with him. He sold his colt for $55.00 the team he hold untill he moves back on the farm the first of Oct. I have no apology to make **with you only** one. When William moves onto the farm go back and when I die you will get your share. You called for $50.00 but I enclose you $25.00 at the present time I have got to pay the taxes in Iowa, call upon some more later on if you get hard up, and Will moves on next fall you go on for I will never sell the farm as long as I live you go and live on it also. I was very glad to hear from you. Wm Slater."

The examination of the defendant as a witness appears to have been preserved phonetically by the stenographer, and it discloses his history as follows:

"My name is William Slater Senior. Oi am 81 and one-half years old, sor, Oi was born in Oirland, sor. Oi am Oirish by birth, a Catholic by faith, and a Dimocrat by the Constitution of the United States. Oi first set me feet on the wharf in New York in the year 1852 and from there Oi went up the Hudson River, sor, and worked on the estate of William B. Astor, whose nephew John Jacob Astor went down in the Titanic. This was at Esopus on the Hudson River and Oi hired out then to another of them big bugs who has a country estate on the Hudson River, a man by the name of Pell, another sich man as Astor. From there Oi went to South Carolina and Oi got married and brought the little woman out to Fox Lake, Wisconsin, in 1854. From there Oi went to the territory of Minnesota into Rochester, settled on Section 12, Northwest Quarter, Olmstead County. Remained there 18½ years. From there Oi immigrated up to the farm Oi have now. Oi couldn't tell you the exact years it was but Oi can give you a pointer so that you can get at it. Oi went to the polls and voted

against Grant the last time he run and Oi would have to count the presidents and count the time and that would take too long for me to do for ye now. In '74 if Oi ain't mistaken, Oi come here to Worth County. Oi had one child at Fox Lake and raised six on the farm, brought my family to Worth County in sleighs, sor. Had eight children in all, sor. They are all dead now but the two men here, Johnnie and William Slater, Jr."

On cross-examination, he testified also as follows:

"Q. Did you tell him that day that, if he did go away and straighten up and quit drinking, you would keep the farm for him? A. Oi never did. No, sor. When 1 bought the farm, I bought it to keep until I died. Then he can have it, he and William. Q. You intend to give it to him when you die? A. Yes, sor, Oi will niver go back on him, no matter what he does to me. Ould Billy Slater niver went back on his son, and he niver will. Q. You say that you intend to give it to him when you die. Did you tell him so then? A. He spoke about a will, and I said that I would make no will. When Oi die, you can get all that belongs to you,—you and Billy, you get it all.  *  *  *
Q. Now, Mr. Slater, you stated, I believe, on direct examination, that you wanted the boys to have the homestead, did you not? A. Oi would be only too glad if it was to come out that way, but it is impossible now, Oi'm afraid,—there is six lawyers in it, and they will cut a big chunk out of it—foive lawyers, I should say— or four, we have got four lawyers here—oh, foive, Oi see another one. There is foive of them here. Well, the more the merrier, as the old sayin' is."

The foregoing letters of the parties and the quoted testimony of the defendant do not bear very directly upon the issues in the case. But they are photographic in their nature, and disclose somewhat the personalities of the litigants. And this throws considerable light upon certain

features of the evidence. Each of these parties seems to be a character somewhat *sui generis*.

The second wife of the defendant died in January, 1915. He thereupon proposed that he make his home with the sons for the brief remainder of his time. He also proposed that they make their home upon this farm. This proposal was not welcomed, and this suit was instituted in the March following. We have given no attention to the statute of limitations, because of the continuing residence of the defendant in Minnesota. Lapse of time, however, is a very proper circumstance to be considered as bearing upon the knowledge and understanding of the plaintiff, and upon the question of adoption and ratification. We have read the evidence in its entirety with much care, and reach the conclusion that the trial court properly decided the case. Its decree is, therefore,—*Affirmed.*

PRESTON, C. J., LADD and SALINGER, JJ., concur.